# NEVILLE PETERSON LLP

**ORIGINAL**

COUNSELLORS AT LAW

80 BROAD STREET - 34TH FLOOR
NEW YORK, NEW YORK 10004

TELEPHONE: (212) 635-2730

FACSIMILE: (212) 635-2734 OR (212) 635-0113
e-mail: info@npwtradelaw.com
URL: http://www.npwtradelaw.com

MARTIN J. NEVILLE (NY BAR)
JOHN M. PETERSON (NY BAR)
GEORGE W. THOMPSON (NY & DC BARS)
MARGARET R. POLITO (NY BAR)
MICHAEL K. TOMENGA (DC BAR)
LAWRENCE J. BOGARD (DC BAR)
JOHN A. DETZNER (DC & IL BARS)
CURTIS W. KNAUSS (DC & MD BARS)
MARIA E. CELIS (NY & DC BARS)
JULIA S. PADIERNA-PERALTA (FL BAR)

WM. L. DICKEY
(1932-1995)

WASHINGTON OFFICE
1900 M ST., N.W., SUITE 850
WASHINGTON, D.C. 20036
TEL: (202) 861-2959
FAX: (202) 861-2924

November 15, 2001

Our File: 1339-01

<u>**VIA FEDERAL EXPRESS**</u>
United States Court of International Trade
One Federal Plaza
New York, NY 10278

Attention: Mr. Leo Gordon, Clerk of the Court

    Re: <u>**Holford (USA) Ltd. v. United States:**
        **Court Numbers 95-09-01259; 95-10-01321, and 96-01-00010**</u>

Dear Mr. Gordon:

    On August 20, 2001, Plaintiff filed a <u>Motion for Summary Judgment</u> and <u>Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment</u> in the above-captioned cases. These papers contained a copy of an affirmation of Glenn Fleisher, the manager of operations at Holford's facility in Israel. This affirmation attested to the fact that the records submitted in support of Plaintiff's <u>Motion</u> were kept in the normal course of business.

    The original affirmation was sent to our offices around September 11, 2001, and unfortunately was never received by us. Accordingly, we requested that Mr. Fleisher sign a new affirmation so that the court files contained an original document. Enclosed is Mr. Fleisher's new affirmation, and six copies of same (2 for each case).

    Plaintiff wishes to point out that this replacement affirmation differs from the first affirmation in minor respects. Specifically, the affirmation now contains language that precisely mirrors the requirements of 28 U.S.C. §1746, and references to lengthy and duplicative exhibits

**NEVILLE PETERSON LLP**

November 15, 2001
Page 2

have been deleted. With the exception of these minor, technical changes, the language contained in this affirmation is identical to that previously submitted to the court.

Very truly yours,

Margaret R. Polito

cc: Amy Rubin, Esq - Department of Justice



UNITED STATES COURT OF INTERNATIONAL TRADE

------------------------------------------------X
HOLFORD (USA) LTD., INC.,                       :

                         Plaintiff,   :   Court Nos. 95-09-01259, 95-10-01321, 96-01-00010, 96-01-00108

                           v.           :   Before the Honorable
                                 Judith M. Barzilay
UNITED STATES,                                  :

                        Defendant.   :
------------------------------------------------X

### AFFIRMATION OF GLENN FLEISHER

I, Glenn Fleisher, make this affirmation and statement under penalty of perjury.

1. I am making this affirmation at the request of the principals of my former employer, Holford Industrial, Ltd. Since I am not a resident of the United States, I am affirming this statement under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

2. The records which are submitted in connection with the material statements of fact constitute the business records of Holford Industrial Limited of Israel which were generated and kept in the normal course of business.

3. I am currently a resident of Australia however, from 1992 to 1995 I was a resident of Israel and was employed by Holford Industrial Ltd. as the manager of operations at its plant in Kiryat Shemona, Israel.

3. As manager of operations, I was in charge of most administrative operations in the plant. I

Page 1 of 5

oversaw importing and exporting of goods, scheduling of production and assignment of work to the employees, keeping of financial records, oversight of the financial staff and related matters. Among my other responsibilities I was responsible for the verification and preparation of shipping documents, certificates of origin and multi-country declarations required by U.S. Customs. As such I am fully conversant and familiar with the facts and circumstances involved in these cases.

4.  Although Holford Industrial was in existence prior to 1992, during 1992, John Wu, the owner of the parent company of Holford Industrial, developed a plan for the production of garments which involved the manufacturing of the garments in several countries. Mr. Wu was advised by the company's attorneys that if he cut fabric in Israel and then assembled it elsewhere, it would be considered a product of Israel under U.S. law. He was further advised that if at least 35% of the direct costs of processing and materials were of Israeli origin and the goods were shipped directly from Israel, the product would be considered duty free under the Israel-U.S. Free Trade Agreement.

5.  Wanting to take advantage of this duty free program, Holford Industrial established a manufacturing program which was conducted as follows: An order would be placed with Holford Industrial by Holford USA Ltd., Inc., an affiliated company in the United States, for a certain number of jeans or shirts. Holford Industrial would, in turn, order fabric from Yiu Fat Company, its affiliated production company in Hong Kong. Yiu Fat would purchase denim or cotton twill material of Chinese origin and ship it to Israel. Attached as Exhibit A to my affirmation are copies of shipping documents which covered the purchase and shipment of the cotton fabric involved in these cases. To the best of my recollection,

two shipments of fabric totaling about 120,000 yards were used for the products at issue here.

6. After importation into Israel, the fabric would be inspected and then cut. Holford Industrial did not have a large number of cutting tables and it was not necessary to have cutting tickets. Instead, operators would keep cutting records which were submitted on a weekly basis. The records showed the number of "lays", the fabric roll number, the cuts, the percentage of fabric wastage and the average yards of fabric for each garment. The records also showed the style and the size of the garments.

7. As part of the requirements for the FTA, we were required to calculate the direct costs of the cutting production. We were advised by our attorneys and the Israeli authorities that this could not include general expenses and profit but, was limited to the direct costs of employees on the production floor and the utilities and machinery costs associated with the cutting operation. Also included were such related costs as the cost of inspecting the fabric and warehousing it prior to production. Based upon these guidelines, I calculated that the direct cost of production the direct cost of production for each pair of jeans was $0.70 each. This figure was noted on various contracts which Holford Industrial entered into for cutting goods.

8. After cutting, the parts were sent to an outside contractor for subassembly work. Holford Industrial did not have the capacity to do this work on a timely basis. Therefore, we entered into an agreement with Argoman Industries of Yavne Israel to conduct this work. Goods were shipped to Argoman on a daily basis by truck. At the Argoman facility, the following assembly steps occurred: Waistbands were formed and belt loops were sewn on.

In the case of some styles, which had belts, belts were manufactured from the cut material. Pockets were also attached to the four panels of the jeans. After the subassembly process was complete, the parts - now identified as panels, were returned to Holford Industrial for export from Israel. Because Holford Industrial had limited financial resources, Argoman was paid by Yiu Fat for the subassembly work. Argoman was not affiliated with either company and was a completely independent operation. All of its operations were conducted in Israel. The cost of subassembly work varied according to the complexity, the number of parts and the priority of the work. It was a price quoted to us by Argoman and generally was about $2.50 per pair of jeans.

9. Immediately upon the return of the panels, they were exported by Holford Industrial and sent to Hong Kong.

10. Although I was not present in Hong Kong, it is my understanding that the panels were assembled, washed and labeled in China by various subcontractors. They were then returned to Israel in order to comply with the requirements for direct shipment from the United States to Israel. Upon return from Israel, the goods were unpacked from the containers, sorted according to the requirements of the order to be shipped, inspected and where necessary, repairs were made. Again we calculated the direct costs of processing the jeans. This included the cost of importing and trucking the jeans to the facility, the opening and sorting of the boxes, the inspection of the goods, the preparation of the necessary packing lists and other documentation for shipment, and the return trucking to the part. This was calculated to be $0.20 per unit.

11. When the goods were exported to the United States, we were required to certify that they

complied with the requirements of the FTA; in particular that the goods were cut in Israel and that the direct costs of processing exceed 35 percent of the appraised value of the goods. I prepared these certifications based upon the books and records of the corporation and the guidelines discussed above. We never included the profit which Holford Industrial made on each contract nor did we include any of the administrative expenses or costs we were advised were general expenses. In most cases the percentage of direct costs of processing in Israel exceeded 40%.

12. After the documentation was prepared, the goods were shipped directly to New York and imported by Holford (USA) Ltd., Inc.

13. Holford Industrial utilized this program until late 1993 when it became apparent that the time and costs involved in the shipment of the panels back to China and then returning them to Israel was excessive. Holford Industrial then ceased using this system.

14. I have made this statement based upon my review of the records involving these shipments, and my knowledge and recollection of Holford's books and records. Since Holford Industrial is no longer operating and I no longer reside in Israel, I have not had the occasion to reexamine the remaining books and records.

October 26 2001

Glenn Fleisher

## CERTIFICATE OF SERVICE

I, Margaret Polito, hereby certify that I caused the attached Affirmation of Glenn Fleisher to be delivered as follows on November 15, 2001.

**BY FIRST CLASS MAIL**
**POSTAGE PRE-PAID**
**RETURN RECEIPT REQUESTED**

> Amy Rubin, Esq.
> Trial Attorney
> United States Department of Justice
> Commercial Litigation Branch
> Civil Division
> 26 Federal Plaza
> New York, NY 10278

Margaret R. Polito

RECEIVED & FILED

2001 NOV 16 ᅵ P 12: 04

U.S. COURT OF
INTERNATIONAL TRADE
LEO M. GORDON, CLERK